Good morning everyone. Let me begin by saying that Judge Rendell and I are absolutely thrilled to have sitting with us again for the second day Justice O'Connor. It is a wonderful event in the life of the court and we thank you very much for being with us. Well I'm honored that the panel would tolerate me for a second day. Public Citizen Health v. OSHA and Edison Electric Institute v. OSHA. Are you ready to proceed? Good morning. May it please the court, I am Stephen Yohei on behalf of the Edison Electric Institute. We have three basic points to make this morning to the court. First, contrary to section 6F of the Occupational Safety and Health Act, in the OSHA has not shown substantial evidence that in the power electric power generation industry and in the power generation workplace in particular, employees are at substantial risk of adverse health effects from hexavalent chromium in the sense that significant risks are present and can be lessened or eliminated by the requirements of OSHA standard. There's no clear statement of section 6E and the basic principles of the Administrative Procedure Act as to why OSHA chose to regulate employees and power plants in this standard. And just to be make the court, clear to the court, we're talking really about two broad categories of employees and one is those who work in electric utility boilers that are opened up periodically for maintenance and may be exposed to fly combustion in which there's no dispute. Trace elements of hexavalent chromium are typically present but in very, very tiny amounts. And second is the category of employees welders who may be working both in a boiler during maintenance but also in other facilities, I might add, also in nuclear plants and we need to mention those as well. There's also no explanation why, and to make this clear, OSHA chose to regulate this industry in this standard. The Edison Electric Institute, shall I say... May I ask, OSHA seems to take the position that welding is welding wherever it occurs. That is their position. And it produces certain risks. Now, do you agree with that? No. Welding does not produce certain risks. Welding may produce certain risks, but not all welding is the same. There is an extensive study of this issue in the record provided by the Electric Power Research Institute, known as EPRI, which, although funded by the utilities primarily, is highly regarded and highly respected as an objective evaluator of science. And their comments, which are referred to at quite some length in the preamble to the standard on a variety of issues, make real clear to the Court why one cannot say that all welding is the same. And the main feature that distinguishes welding and power generation from the welding that was studied in the two principal studies that OSHA relies upon is duration. The studies that OSHA relies upon, and there are really only two, were conducted in the chromate industry. And I think it's fairly clear. In that industry, you're in a closed environment and you have welders doing work consistently. In fact, the studies reached their conclusions based on the assumption of 45 years of exposure. Whereas in power generation, and for that matter in other areas of welding, but particularly in power generation, welding can go on very briefly. In fact, there is a discussion in OSHA's proposed standard, where it talks about monitoring, difficulties of monitoring, that, for example, a welder in a boiler may be done with his work in one day and then may move on to another spot or even less than that in a matter of moments. So duration, ventilation, clearly is a significant factor. Power plants are 14, 15 stories high. There's not only natural ventilation, but... But isn't there a wide range of discretion here where OSHA can choose its type of methodology? There may be other ways to do it, but can we really say that this should be overturned on the facts in this case? Yes, Your Honor. This case really is quite similar to the decision of the Fifth Circuit in Texas Independence genders, which we cite in our brief. And in that case, really quite a striking analogy. OSHA relied on evidence of significant risk in the textile industry from exposure to cotton dust, but said, no, you cannot take that same evidence and just simply assume that you can use it in the cotton ginning industry, where exposure to cotton dust is intermittent, it's of short duration, it's seasonal. OSHA is notwithstanding the fact that it has a certain level of discretion, that is trumped by the requirement of the statute, as interpreted in Benzene, that there be substantial evidence of significant risk. What data did you produce? What data did you produce? They have to look at the best available evidence, and presumably that evidence has to come from those who are commenting and those who are disagreeing with what they propose. What did you produce in the way of evidence to show you should be treated differently? Your Honor, prior to the publication of this proposed standard, this industry had not studied employee exposure to hexavalent chromium in power generation because there had been no health effects observed. So, frankly, there wasn't any data in the industry to produce about the effects of hexavalent chromium on employees in this environment. That's part of our point. It hadn't been a problem. Had it been a problem, it would clearly have been studied. And you applied for an exemption? Is that correct? No, we argue that there isn't a basis for regulating fly ash in this. Well, doesn't OSHA take the position that power plants can apply for an exemption on a plant-by-plant basis? OSHA's position is that it wrote – Do they take that position? Not exactly, if I understand the bare argument correctly, Justice O'Connor. Well, we can ask them. Well, I would like to respond to that point, if I may. The standard is written in a way that allows an employer to assemble what is considered to be historical or objective data, basically a record based on a long period of monitoring, which, if it demonstrates a lack of exposure, can be a basis for exemption. But that doesn't work in power generation, particularly in maintenance in a power plant, and that's part of our point. That assumes that one has the opportunity to take a history of exposure monitoring, which is very difficult to do in a power plant. In fact, in the proposed standard, OSHA had proposed in construction not to require exposure monitoring, which is the predicate for this exemption, that is, a collection of data. OSHA explains, frankly, better than I could, why it's difficult to conduct monitoring in an environment where the conditions are constantly changing. So, yes, it's there, but realistically it doesn't work in this industry, and that's part of our point. We have a standard which may – that principle may work elsewhere, where you have a stationary environment and you can collect the data. Now, the other part of our response, Your Honor, is in answer to your question, Judge Rundell, frankly, in the 90-day period we had for comment, one cannot simply go into a power plant and take environmental samples. You have to wait for it to be shut down. You can only do these samples, take these environmental samples during an outage. OSHA had this under consideration for years, this whole concept. In fact, we told them to get busy and get the standard established. So there was an understanding that you were at risk if you did nothing, wasn't there? No, Your Honor. It was never, with all due respect to OSHA, it had never been suggested that the electric utility industry would be caught up in this standard. As I understand what happened here, as you look at the history of litigation before this Court, the focus was on the chromate industry, where exposures are, you know, sort of all day, every day, or close to it. Frankly, it wasn't until we read the proposal and saw that the scope section said this applies to all exposures to hexavalent chromium that Edison Electric Institute and its members said, my goodness, this thing seems to apply to us. It came as a total surprise. It was never regulated under the old standard? There is an exposure limit to hexavalent chromium, but it's so high. It's just not been an issue in this industry. But it was applied across the board, so that for them to single out industries other than yours would have been to really change the application, wouldn't it? With all due respect, I'm not sure I understand your question, Your Honor. Well, if the 52, was it 52? It was a universal permissible exposure limit. I mean, it was universal. And you say you didn't anticipate that whatever lower standard would be universal as well? Well, there are, you know, people in power plants are exposed to a variety of substances, and perhaps much more immediate concern. For example, OSHA has regulated lead. OSHA has regulated arsenic. And I dare say that as one allocates one's resources in looking at health issues, one doesn't imagine, you know, we need to study everything that's not a problem. And there hadn't been any evidence of illness in the industry from this particular trace element. And remember, we're speaking about a trace element in dust to which people are not routinely exposed. They're only intermittently exposed when the power plant is taken down and then only on an intermittent basis. Didn't one of the nine samples have a very high level of chromium? One of the nine samples of coal, as I recall, had one excursion. That's correct, yeah. There's no argument, Judge Sirica, that hexavalent chromium can appear in fly ash. Tell us why the exemption process doesn't work for you. Again, realistically, it would require those in the industry to go out and try to collect a history of samples in a variety of environments. Remember, coal is not uniform. For example, in the West they burn what's called powder river basin coal, which is less flammable, or more flammable, I should say, but perhaps has less sulfur content. In the East it's Appalachian coal primarily, and I'm vastly generalizing a whole separate subject. But there are a variety of coals out there, so one needs to go out and conduct a variety of studies. This can't be done overnight. In the meantime, power plants, when people prepare to do maintenance on a power plant, that's a process that begins a year before it happens. It's a very elaborate process, so realistically it doesn't work. And, of course, in the construction industry, the same reason we would say it doesn't work is the same reason that OSHA chose not to apply this scheme into work that it considers to be construction. And I do want the Court to understand that doesn't necessarily mean construction industry. OSHA's definition of the term construction is metaphysical in the sense that it doesn't mean construction industry. It means repair work, but it doesn't apply to maintenance work. Believe me, I've spent a lot of time trying to give advice over the years to clients, trying to explain what that difference could be. And the essence of it is if you improve something, you're engaged in construction, but if you don't, you're engaged in maintenance. It may make for a lot of work for lawyers, but for those who are trying to plan an outage in a power plant, it's a very elusive definition. But if you're in construction, you don't have all these other obligations. So I see my time is up. I forgot to reserve five minutes. I hope I still have them. We'll give you the five minutes. Thank you. Thank you very much. Mr. Nelson. May it please the Court. I'm Scott Nelson representing Public Citizen Health Research Group and the United Steelworkers, and I'd like to reserve five minutes of my time for rebuttal also. It's uncontested in this case that OSHA has enacted a Pell that leaves in place the most significant cancer risk of any standard that it has ever put in place for a carcinogen under the Occupational Safety and Health Act. The standard, based on OSHA's own risk assessment, would yield 10 to 45 excess cancer deaths per 1,000 workers over a working lifetime of exposure. By contrast, the Supreme Court in the benzene case recognized that a 1 in 1,000 risk could be considered significant, and the highest risks that OSHA has permitted under other Pells are 10 and 3 to 15. Ten was for benzene. Three to 15 was for cadmium, which just barely overlapped the lower end of the risk here. So what that means is OSHA acknowledges, of course, that it's obligated to eliminate significant risks to the extent feasible and that it has not eliminated significant risk here in this standard but has, in fact, left in place a very substantial significant risk. Is there a choice here? I mean, it looks like we have a 1 that is too difficult to obtain, either economically or technologically, and a 5 that you contend is wrong. Should we start all over again and look at 3 and 4 and 2? What is the option here? On remand, I think OSHA might have the option to look at standards in between, but I'd like to, if I may, respectfully take issue with the notion that the standard of 1 is, in fact, infeasible because OSHA purported to conclude that it was infeasible but, in fact, made factual findings that, as a legal matter, contradict that conclusion. Well, you have briefs and positions taken by other groups in this process who tell us that picking 5 was too strict a standard and that it isn't feasible, and you have the agency saying that anything under that was not feasible. Now, clearly, OSHA has a wide range of authority here in making these judgments, and so how are we to assess it? Well, OSHA certainly has substantial authority, especially when it comes to factual findings, which will be sustained if they're based on substantial evidence. Yes. And OSHA's factual findings in this case, as to the effect of this standard on industries, we're not actually contesting. That is to say, what OSHA found for the four industries where it concluded that there was a technological feasibility issue was, in fact, that those industries could meet the standard of 1 in most operations most of the time, which is, as OSHA acknowledged in the preamble to the rule and in the final economic analysis, that is the legal standard for feasibility. So we're not here contesting OSHA's assessment of what it would take to get to 1 in these industries. What we're challenging is its assertion that its factual findings sustain, as a legal matter, the finding of infeasibility because, in fact, to take welding for an example, OSHA, in fact, found that most welding operations, by far most welding operations, could meet a standard of 1 most of the time without resort to respirators, 85% of welding operations overall. Even if you look only at stainless steel welding, OSHA found that approximately 80% of stainless steel welding would meet the standard of 1 without respirators. Eighty-five percent of what? Are you talking employees? Are you talking companies? Because they really were looking at the number of employees affected. Is that what you're looking at, that 85% of the employees would be safe? When I say 85% of the employees, when you say would be safe, just to be a little bit clearer, what they found was that under the standard of 1, 15% of welders would require respiratory protection to meet that standard. The other 85% would not. And this is all laid out, by the way, in a table that's found in a couple of places. The most convenient place to look for it, I think, is in the preamble to the final rule, which you can find in Volume 1 of the Joint Appendix at page 160. So it's 15% of welders would need respiratory protection. Twenty-two percent of stainless steel welders would need respiratory protection. Even if you go down to what they call stainless steel shielded metal arc welding, it's still less than 30% of welders would need respiratory protection to get to that point. But OSHA says if they're going to use the technological feasibility analysis, that they're looking at it on an application group basis, not across the board. And so these percentages are – Well, these percentages actually are based on looking at it from their point of view using an application group basis. In other words, looking at welding as opposed to saying welding in this industry, welding in this industry, welding in this industry. This is welding overall. So even kind of buying into their premise as to what the relevant, quote, industry is, what they have found is that the great majority of welders can meet the standard of one without respiratory protection. And, in fact, that only a few thousand additional welders would need respiratory protection to move from five to one. A fairly significant number will need respiratory protection even at the standard of five. And a comparable number more will need it to get down to one. But it's not a matter of impossibility or a real technological barrier. It's just a matter of, you know, are you going to deny workers overall? Because, remember, OSHA kind of builds this up. First it says a minority of stainless steel welders will need respiratory protection. Then it concludes from that it's not feasible for stainless steel. Then it says, well, if it's not feasible for stainless steel, it's not feasible for any welding. And suddenly they say, well, if we can't do it for welding, then we have to adjust the standard to give less protection to all workers because of the problem with welding. Let me ask you about the standard, the uniform PEL and your position on that and why you have trouble with that. Well, as an initial matter, and I'm sure you're proceeding from this understanding, our first position is that a uniform PEL significantly lower than five would be possible. But even if there are some industries that, at the end of the day, can't meet the standard of one, the Act still provides that OSHA must protect workers to the extent feasible. And OSHA itself, in explaining its reasoning in the cadmium standard, said that it's not appropriate to take a least common denominator approach and let the feasibility issues in some industries drive the standard for others. And in this case, what they have done, without even acknowledging that they're departing from that reasoning that followed from the D.C. Circuit's decision in the Brock case about the asbestos standard, they basically said that enforcement problems, it would be too complicated to have multiple standards. And there, I think, their reasoning just doesn't hold up. For example, they say that it's hard to draw lines between these industries, but the industries where they have identified feasibility issues are very discrete industries in general. For example, aerospace painting, they themselves have adopted a separate standard for that. Chromium pigments, catalysts, and dyes affect a very small number of workers. Welding obviously affects a lot more workers, but it's still welding. And the notion that you would tell an employer that this is the standard for welding creates impossible problems of administration. I think it's very difficult to understand, and I think if you read it, it's not really an explanation. It's just an assertion. Employers have to comply with OSHA standards for many different kinds of substances. Both they and OSHA are used to the fact that people in different operations are going to be affected by different considerations in terms of OSHA compliance. And just adding one additional wrinkle would not be an insuperable difficulty. But, again, I want to get back to the notion that I think OSHA's own findings demonstrate that actually all industries can feasibly meet a much more protective standard for workers. Unless the panel has any further questions, I'll reserve the remainder of my time. Thank you, Mr. Nelson. Mr. Stearman. Good morning. Good morning, Your Honor. May it please the Court, my name is Gary Stearman on behalf of the Occupational Safety and Health Administration. I thought I'd start first with EEI's challenge and then move on to public citizens. EEI's challenge essentially argues that its welders are exposed less than other kinds of welders. The information that OSHA had before it in the rulemaking, generally speaking for welders in the utility industry, was varied. There was no definitive explanation or description of the amount of welding that actually took place in the utility industry. In fact, information submitted by EEI indicated that its welders were exposed quite a lot to hexavalent chromium. In particular, in the record at EEI's supplemental appendix at 869, its expert wrote, exposure durations for welding in the different reporting companies typically occurred from six hours per day for two days a week per year to three to eight hours daily, with a maximum of ten hours per day on power outage days. So the information we had was that welders in the utility industry were exposed quite a lot, and in fact, their exposures were no different than other welders. Now, as far as the scientific evidence goes, EEI's second position is that the information, the science that OSHA relied on involving chromate production worker studies couldn't be applied to welders generally. OSHA spent a lot of time and explanation in the preamble going through the science. The case law suggests over and over that OSHA isn't required to make determinations approaching anything like scientific certainty. And really, the courts have said over and over again that the courts lack the expertise to make these scientific judgments. What OSHA determined was that the scientific information that the utilities provided, in particular the Guerin welder study, was faulty for a couple of reasons. First, the exposure data in that study was unreliable. There were severe exposure misclassifications for the potential for that, so OSHA couldn't rely on it. And the other problem OSHA had with that particular study was that the number of workers that were studied, was studied, was too small to tease out risk at a low level. And that explanation is found in the preamble in the joint appendix at pages 95 and 96. The significant risk that we found, there's a table in the appendix at page 126, shows that exposure for as little as five years results in a significant risk. So if you take the amount of time that the electric utility industry says its workers are getting, it's clearly beyond five years, and so there's significant risk there. But the overall point, the general legal framework here, based on the benzene case, is that OSHA doesn't have to do a significant risk analysis on an industry-by-industry basis. That would be awfully time-consuming. It would be extremely burdensome. The court can look at the record it has before it and imagine how that would be multiplied by the hundreds of industries that OSHA would have to look at to make a separate risk analysis for each of them. Here what OSHA determined was that exposure to hexavalent chromium was harmful. That was the common agent of concern here, and it's the primary determinant of risk. A number of cases have upheld a significant risk determination based on that, the lockout-tagout case, blood-borne pathogens. And you are permitted to be conservative or overprotective and err on that side according to the case law? That's correct, Your Honor. In fact, Section 6B.5 of the Act says that we are to regulate as if a worker is regularly exposed for 45 years of working life. How does that fit, moving away from the EEI to the other argument, how does that fit when under the standard you've adopted at five, you have 10 to 45 instances, you basically have 5% of the exposed employees experiencing the actual injury. Five percent, that's a lot, isn't it? Given the standard that you're supposed to achieve the best. Right. What the statute also sets out, and this is a separate statutory requirement, is that we are to regulate to the extent feasible. So if you look at our standards, our health standards, none of them, I don't believe any of them, get down to the level of prohibiting or precluding any significant risk. So you have on one hand the requirement to regulate to significant risk, but that is bound or circumscribed by the requirement that we can regulate only to the extent feasible. One thing that concerns me is the requirement for notifying employees at the action level of the risk, and I'm not certain why OSHA chose not to impose the notification point here. I just don't understand that. I think the reasoning was that OSHA did not believe it would provide a significant health benefit. Well, now, isn't it the general practice at OSHA to require notification? Well, OSHA in the past, in many other health standards, has required that. Why would it appear when this is regarded as a dangerous substance? I don't understand. Well, Your Honor, I believe that the notification requirement requires if there's an exposure above the Pell, we have to notify the employee. But if it's below the Pell, or it may be the action level, I'm not quite sure on that, Your Honor, we don't have to notify the employee. Other standards that are on the books that are referenced in the hexavalent chromium standard here provide employees with the ability to get that information. There's the hazardous communication standards and the medical record standards. Yeah, but you have a situation here where they're arguing, gee, you could have set the standard at 1, not 5, and you want us to sustain setting it at 5, which makes it likely that far more employees will be injured in their health. And yet, at the same time, OSHA doesn't want to notify those employees when it's above 1. Right, well, I think that's a little bit of a concern to me, and I'd love to know your answer. Well, I think my answer is that the Act requires Section 8HC3, requires notification when the Pell is exceeded. But that hasn't been your practice, has it? It's always been if there is exposure, they are notified with other toxins. Isn't that correct? In the vast majority. There's one exception to that, which is a pretty big exception, Your Honor. It's Section 1910-1000, the air contaminant standard, which covers 600 different contaminants. And in that, we don't require notification if exposure is below the Pell. So that's the general catch-all air contaminant standard. And so, I mean, if you wanted to weigh it out, the vast majority of contaminants we don't require. Are they carcinogens? Many of them are, yes, Your Honor. Shouldn't we have OSHA at least explain why they did it this way? It seems arbitrary on its face that you wouldn't notify unless it's over 5. It seems arbitrary in light of past practice. Well, again, it may depend on the kind of chemical that's involved. Again, I think there was – We know what the chemical is. Aren't we talking about the same chemical? I can't pronounce it right, but the chromium hexavalent. Right. Your Honor, I don't want to suggest to the Court that this chemical is any less hazardous than the others. I think the reasoning that OSHA took in this particular case was that it would only provide a de minimis health benefit, that there were other avenues for – The notification. Right, for notification. There were other avenues in which employees could get this information. And I would also point out that going from the proposal to the final, we added this notification provision to the shipbuilding and construction area. So there was sort of this balancing, I guess, going on. But getting back to public citizens' main argument having to do with technological feasibility, because I think that's really the crux of their case, there's this fundamental disconnect between what public citizen is asking the court to do in reviewing the evidence and in its interpretation of most operations, most of the time standard, with the fundamental understanding that the courts lack the expertise and the competence in this area to make substantive health and worker safety judgments. Public citizen has read most operations most of the time as imposing five separate restraints or restrictions on how OSHA analyzes the evidence. Public citizen tells the court that OSHA can't consider just the operations where there's an exposure, that OSHA can't consider the number of employees affected, that it can only consider the number of operations, that OSHA can't even classify the evidence in the way that's most rational, and in this case it was the application group. Another very important restriction public citizen wants to put on OSHA is that OSHA cannot or OSHA has to look at these operations in isolation without considering the impact one operation might have on another. And finally, from what I gather, public citizen is suggesting a bright line 50% respirator use test most of the time, most operations. Do you believe that's dangerous or ill-advised? That is extremely ill-advised. It's bad industrial hygiene,  and if you go back to the lead one case where the test originated, there's no indication there that there was some sort of workplace safety and health concern that gave rise to the test. It's an arbitrary test, and it's an artificial test. Now, at some point, respirator use is going to be too much. Some respirator use may be okay in one circumstance, and that same amount may be ill-advised in another. So one of the questions the court should consider is understanding that there is a line at which respirator use becomes infeasible. Who's to make that judgment? Is it the court establishing a 50% test, or is it OSHA, with the expertise, with the competence, with the knowledge to weigh the factors that are involved here? It's an extremely refined determination that OSHA has to make, and this is all set out in the basic principle of the hierarchy of controls, where OSHA says that respirators or that engineering and workplace controls are to be preferred over respirator use because respirator use in and of itself can be dangerous. There are many drawbacks to it, physiological, psychological, workplace safety. Respirators can affect vision, affect communication. They make the workplace more dangerous, and that's why OSHA prefers the engineering controls. Now, this bright-line test basically wipes out this very nuanced judgment that OSHA has to make on a case-by-case basis. How do you come up with the number 5 as compared to any other number? When I looked at the chart of where these exposures were, it seemed there was a lot below 5. 1 to 5 was very large, and then when you got over 5, the exposure wasn't actually that great. Who decides whether 5 is appropriate or 4 or 3 as compared to 1? Well, I think the respirator use chart is just the beginning of the analysis, if I'm understanding the court's question. OSHA looks at the amount of respirator use in an operation, here, for instance, SMAW welding and confined space welding. It was very high, or it was too high for OSHA to tolerate. Then OSHA looked at that information, looked at those operations, and saw how it affected the workplace overall and then made the determination that it couldn't find feasible all welding operations because of the bleeding effect that these particular operations would have on others and the fact that a welder is going to be doing more than one of these operations on any particular day. So it was really impossible to tell what his exposure would be overall. That's how we reached the 270,000 number for welders. Then we looked at some other industries, aerospace, for instance, where for two-thirds of the operations in painting, we separated it small, medium, and large airplane parts, and for medium and large, we couldn't reach. It was infeasible for that, so that group became infeasible. So we did this calculation and came up with a majority of workers for which it would not be feasible. At that point, we determined that one was infeasible. Now, we did essentially the same analysis with five, but that was much different because the respirator use to start with per operation was acceptable to OSHA. So we didn't have to go through all the steps. If all the operations in the first place have acceptable respirator use numbers. Now, these are the one versus five to start with. OSHA does not have the capability to do an analysis one, two, three, four, five. That would be too time-consuming. One of the problems with public citizens' argument here is that if we were to go back and do the analysis at one, who's to say then we shouldn't have done 0.5 or 0.75 for our particular industry? Well, you rely upon data that's given to you. Is that correct? And as I read your brief, you say you weren't given data or recommendations as to setting the level anywhere in between. So I'm assuming that's the case, and to do it would be too time-consuming. Or maybe that's just not done. The best available evidence ends up being not evidence that you go out and seek, but evidence that is provided to you by those who are commenting. Is that correct? That's not entirely correct because OSHA does go out and obtain evidence. We'll go out and do site visits. We have contractors that do that, and we have an awful lot of historical data that we have accumulated through visits from our compliance officers going to the various work sites. But you don't conduct studies or research on your own. Is that correct? Well, other than the site visits, I believe that's the case. We'll go out and obtain scientific studies. We'll look at the information that's out there, and then we'll make an analysis from that. Given the variances in the different industries, you talked about the aerospace painting where it seems to be the most significant risk of any, and at the other end there may be parts of the power industry Mr. Yohei was talking about where there may be less risk there. How do you justify the uniform PEL in these areas? Well, as a legal matter, the statute doesn't require more than one. Correct. And the asbestos cases have said that we can go with a uniform PEL provided we provided the explanation. And I think our explanation here is adequate. I know that's where the court really wants to hear about it. We set out three areas where we found it impractical to set more than one PEL, in compliance and in our line drawing in the first instance, and then in our rulemaking as well. As far as compliance goes, the difficulty arises where an employee is exposed to hexavalent chromium in two different ways, or you might have two different employees exposed at two different levels doing two different operations in the same workplace. The exposure from the multiple sources in close proximity makes it very difficult, if not impossible, to determine for any particular employee where he's getting that exposure. The employees wear these monitors that account for his exposure, her exposure during the day, and they don't differentiate between where that exposure is coming from. So an employee may have an overall exposure that's greater than one of those PELs, but less than the other, or it may be greater than both. And we don't know where that exposure is coming from, which operation, because there are workplaces where welding is conducted, and that might be one PEL, for instance, although you might want to have PELs for different operations within welding, another complication. But you might have an exposure from welding, and you might have an exposure to hexavalent chromium in some other way. For instance, steel mills have a number of different operations where the workers are exposed to hexavalent chromium in different ways. But my guess is, I'm almost certain, that welding also takes place in steel mills. And welding itself spans 60, 70 different industries. So is the basic answer of OSHA that the administrative difficulties are just too great? That's right, Your Honor. That's what it comes down to. Yes. The administrative, in trying to enforce it, in trying to reasonably have employers comply with it, the difficulty in setting out where the different PELs might be for different industries, trying to make some sort of determination as to – Good. Let me ask you about something else. Okay. What about the action level? It's alleged that it was too low. And how does that in any way factor into the notification, or does it have any relationship with the notification requirement? Or are they entirely separate? We don't consider them together. Well, let me address the action level. This is a situation, or an argument, that public citizen really has not explained what the health benefit is. And again, the asbestos 2 case says that OSHA isn't required to provide substantial evidence when it rejects evidence. All it has to do is provide an explanation. And so it was really public citizen's requirement to show the health benefit for a lower action level. Now, the action level has never been tied to the risk determination. It's been tied to the PEL as a way of getting employers to meet the PEL. And it's really important to realize that there's no legal requirement on the employer's part to meet the action level. It's voluntary. It's a way of getting employers to comply with the PEL. This goes back to Justice O'Connor's question, the connection between the two. And I apologize. I need to go back and look at the regulation to see if the notification provision kicks in at the action level or the PEL. I'm not really sure of that. And I think it's easy to find that out. If I brought my standard up with me, I could tell you. But I don't think there's any policy reason for tying the two together. I think they're intended to meet different goals. But there would be a policy reason to tie it to the action level, wouldn't there? I mean, it is tied to the PEL, as far as I could tell. And that seems to be of little use at that point, or not as much use as if it were at the action level, and definitely inconsistent with prior practice. I think the action level is, past practices, it's tied to one half of the PEL. Whether it's tied to the notification level or the PEL, or whether the notification is tied to the action level historically or to the PEL historically, I'm not sure of the answer to that. The Mr. Yohei talk says that the exemption is not a feasible route for the fly ash issue. Right. That's why that's not why you disagree. I don't quite understand that answer, because the exemption says that employers can take advantage of it if under no expected use the exposure will be below 0.5. If the fly ash argument is, as EEI says, then the vast majority of cases will be below that 0.5. And all they need to do is demonstrate that to you, provide data? That's right, and OSHA expects that that would actually happen. Now, they're required to provide objective data, and the definition of that includes a chemical analysis of the material that contains the hexavalent chromium. And there's really two issues here on the electric company. There's two kinds of exposures. One is the fly ash, and the second is the welders. And the welders, as I stated earlier, is no different than any other welders. And if there's exposure to hexavalent chromium through welding in the electric utility industry, that's a sufficient basis for us to regulate them. And it doesn't matter, really, what the fly ash levels are. What about their argument that they really had no way of knowing that this was going to be something that was going to regulate them? Well, they have welders, and their welders are exposed to hexavalent chromium, and hexavalent chromium was regulated before this rulemaking. But was it regulated as per welders, or was it on an industry-by-industry basis? It was regulated for all who were exposed to it. Well, but, I mean, the 52, did that apply? That applied to the utilities. It applied across the board. I only have a little bit of time left. I'd like to make one general point here, and that is when this rulemaking started, the Pell was at 52. The department has brought it down to 5. That's a 90% reduction. Public Citizen wants to bring it down to 1. That's a 98% reduction. So all we're talking about here is the residual risk, this remaining 8%. Now, if you put that 8% into the case law, which says OSHA doesn't have to promulgate a perfect Pell. It only has to promulgate a Pell that's within the zone of reasonableness. This argument about 8% seems to me to fall within that zone of reasonableness. And I think, therefore, it should be upheld. I'd also point out that the vast majority of workers, 80% of the workers, are already exposed below 1, even at this point, without any controls whatsoever. They don't need further protection. They're sufficiently protected as it is. And so what we're talking about is these troublesome groups, really, these four groups. And I think OSHA has dealt with those groups in a rational way and in a way that this Court should uphold. Any other questions? Good. Mr. Stierman, thank you very much. Mr. Yohei? Thank you, Your Honor. I'm going to try to make four or five bullet points within the four or five minutes that I have left. First, I do think it's important to make clear, while we have argued that the record doesn't support applying this standard to the electric utility industry. Doesn't support what? Applying this standard to the electric power generation industry. Okay. The reality is what EEI has said to OSHA is that if OSHA had chosen to regulate power generation in the same manner it has regulated construction, that's something that could be lived with. And I have no problem saying that out loud, and not as a concession, because that's what we said throughout the rulemaking. So I want the Court to be assured this industry is not saying we're not interested in protecting the people that work here. They are, and they're prepared to do it in that way. Second, in response to Mr. Stearman's point about what our so-called expert has said, I commend EPRI's comments to the Court. They begin at the EEI supplemental appendix, volume two, at page 865. And in particular, the paragraph he referred to, that he read to you from at the beginning of his argument, goes on to say, not that welders are exposed, you know, all the time, but in fact the last sentence in that paragraph says, from this limited sample it appears that welding operations in general are not full-time activity for many workers. That's at page 869 of that supplemental. And then in direct response to his point that welding is welding, what EPRI has told OSHA, and it's the only evidence on the record on this point really, is, quote, welders do not constitute a homogeneous occupational cohort, nor do they have homogeneous exposures. Not all welding is the same. There are very significant differences. EPRI goes on to explain not only are the distinctions in the nature of the work, the duration, the time of exposure, but I will not burden the Court with explaining all of the science that EPRI goes into, that when one welds on various forms of steel, that liberates various different kinds of chemicals. They're not all the same. The exposure is not the same. The risk is not the same. OSHA had the obligation to deal with that issue in the utility industry. Its position that it is not required to regulate or examine industry by industry is just simply wrong. The Texas independent generous case makes clear that you cannot take apples and apply them to oranges when it comes to looking at issues of significant risk. Yes, it's a burden, but that's what the statute requires, and that's what the Supreme Court has said in Benzene. And, of course, OSHA did make distinctions here in this rule between general industry, the aerospace industry, which got a different break, and OSHA managed to exempt Portland Cement entirely. So, clearly, they have no problem making distinctions where they want to make them, where they think it's appropriate. Also, in response to Judge Rundell, if one would look at the few that I asked you to have a look at the EEI opening brief, page 18, you'll see reference there to evidence we put in the record of material safety data sheets, which, to translate, are the kinds of dark things that you see when a manufacturer provides a product and is required under other OSHA regulations to describe in great detail its chemical composition. Fly ash is also a commercial product. It's sold. And so when that happens, you have to supply a material safety data sheet with it. We put some examples of those in the record, and they support our position that you just don't find excess levels of hexavalent chromium in fly ash. And the last point I wanted to make is that also in response to Judge Rundell to your question, OSHA has a variety of ways of getting evidence. First, there is the organization known as NIOSH, the National Institute for Occupational Safety and Health, which is in Health and Human Services, which is the research arm that was created by the statute. And they very often conduct scientific research and will come to OSHA and say, This is what we found. This is what you ought to do. Here's the evidence. And it's a vast organization, and they collect data. Second, in addition to the industry, Mr. Stearman correctly pointed out that OSHA hires experts to go out and do literature searches, and yes. But also they have the ability, as they have many, many times, even going back to the days of asbestos, to deal with the medical community. There's research going on on occupational exposures all over the place, as well as there should be. So there are lots of sources, lots of sources. Indeed, they're relying on scientific research that was done in the chromate industry. So it's not simply a matter of industry coming forward and saying, Here's what we have. And ultimately, from a legal point of view, the burden of proof is OSHA's. It's not the industry's. And you say that the studies from the chromate industry are not? They're not probative of what goes on in other forms of welding, as the record shows. I dare say that OSHA is making an assumption rather than pointing at evidence. I'm pointing at evidence. I'm pointing at expert evidence, which OSHA characterized as expert, from EPRI, which goes into great detail explaining why welding is not welding in every instance. There are very important distinctions, and OSHA has to deal with those things. You can't just set them aside. I thank the Court. Good. Mr. Yohei, thank you very much. Thank you, Your Honor. I'd like to start for a few moments on the notice issue. OSHA now says that the reason it didn't provide for all workers to get notice of monitoring result, as it has done in every prior rule that requires monitoring, is that it didn't see a health benefit. But, in fact, if you look at the preamble to the final rule, there's no explanation whatsoever for why they deleted the notice requirement. So the explanation that has now been offered is just a post hoc rationalization, and frankly one that doesn't even make sense as a post hoc rationalization. There's no explanation for why it's beneficial to let workers know monitoring results in other cases, but not this one, particularly when, in this case, triggering notice at the Pell means that workers will not be informed of risks that OSHA acknowledges are very significant at lower levels than the Pell. OSHA also says, well, in the air contaminants rule, there's no requirement to give notice. That's because in the air contaminants rule, there's no requirement to do monitoring. Obviously, if there are no monitoring results, there are no results to give employees notice of. But if you do have the results, there's no reason to require workers, in effect, to make a FOIA request to get their monitoring results. They should be provided, as has been done in every other rule, and OSHA has not explained why it hasn't done it here. Now, as to feasibility and the standard, I'd like to first start by saying, I think that the issue is not whether OSHA's rule is in some sort of general zone of reasonableness or that the difference between a 90% reduction and a 98% reduction is close enough for government work. The standard here is that OSHA is required to reduce significant risks to the extent feasible, and there's a legal test for feasibility, which is whether most operations for a typical employer can meet the standard most of the time without respirators. Now, OSHA says that's an arbitrary, judge-made rule, but in fact it's the rule that OSHA itself said it was applying in this case, and one of the clearest statements of that is on the very first page of the chapter of the final economic analysis that deals with technical feasibility. That's in the joint appendix at page 586. OSHA says the standard is whether most employers can meet the standard in most operations most of the time without respirators. OSHA also says, well, you know, you shouldn't apply an arbitrary 50% rule, and I'm not sure if the difference were between 49% and 50%, maybe that would be arbitrary, but in this case OSHA has not even come close to showing that in any of these operations or industries most employees would have to use respirators to meet this standard most of the time. In welding overall it's only 14%. Even in stainless steel welding it's only 22%. In hard chrome it was 35% of the employees engaged in hard chrome plating, which was only, I think, less than a tenth of the overall employees who were in plating overall. So that was a minority of a minority would require respirators in hard chrome. In pigments and dyes and catalysts OSHA found that a lower standard would require only intermittent use of respirators, and again, only by about a third of the employees in those industries. And in all of these industries, even under OSHA's standards, there would be significant numbers, that is to say a few hundred in some industries, a few thousand in welding who would need respirators. Going down to five would require only a few hundred more in the case of painting. I think 500 more painters overall would need respirators to get from five to one, and that includes the aerospace painters. And so we're not in a case where we're even close. Judge Rendell, you asked about five versus one. There seems like there's a big gap there. OSHA said these industries can't meet one and then it made the jump up to five. I don't see any explanation in the record as to why they did not consider anything between one and five. But you're not actually arguing that they should have. That's not one of your arguments, is it? Well, my principal argument is, you know, we argued for a standard less than one. One is not our ideal number, but we think that OSHA's findings reveal that one is feasible for everybody. And at a minimum, when OSHA makes those findings, that's what it has to follow through on. If there are no further questions, I'll rest. Thank you. Mr. Nelson, thank you very much. The case was very well argued. We will take the matter under advisement. We would like to have a transcript of the argument, and I would ask that the parties share the cost of that transcript. And if you will check in with the clerk's office, they'll tell you how to do that. Thank you very much. Please rise. This court stands adjourned until Monday, December 1st, at 10 a.m.